**KIZIRIAN LAW FIRM, P.C.**
Armand R. Kizirian, SBN 293992
550 North Brand Boulevard, Suite 1500
Glendale, California 91203
Telephone: (818) 221-2800
Facsimile: (818) 221-2900
E-mail: armand@kizirianlaw.com

Attorneys for Plaintiff
Malaga Cove Ranch Market, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

MALAGA COVE RANCH MARKET, INC., a California Corporation,

Plaintiff,

v.

CARDCONNECT, LLC, a Delaware corporation; FISERV, INC., a Wisconsin corporation; and DOES 1 through 25, inclusive,

Defendants.

CASE NO. 2:26-cv-04747-FMO-AYP

**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**

(1) UNFAIR COMPETITION (Cal. Bus. & Prof. Code § 17200, et seq.);
(2) CIVIL THEFT (Cal. Penal Code § 496(c));
(3) FRAUD;
(4) BREACH OF EXPRESS CONTRACT;
(5) BREACH OF IMPLIED-IN-FACT CONTRACT;
(6) DECLARATORY RELIEF (PLAINTIFF INDIVIDUALLY); AND
(7) DECLARATORY RELIEF (CLASS-WIDE).

DEMAND FOR JURY TRIAL

Plaintiff MALAGA COVE RANCH MARKET, INC., a California corporation, ("Plaintiff"), hereby files this Second Amended Complaint against Defendants CARDCONNECT, LLC ("CARDCONNECT"), a Delaware corporation, FISERV, INC. ("FISERV"), a Wisconsin corporation, and Does 1 to 25 (hereinafter collectively, "Defendants"). Plaintiff is informed and believes and on the basis of that information and belief alleges as follows:

## PARTIES

1. At all times material to this Complaint, Plaintiff MALAGA COVE RANCH MARKET, INC was a California corporation doing business in California with its principal place of business in California.

2. At all times material to this Complaint, Defendant CARDCONNECT, LLC was a Delaware corporation doing business in California.

3. At all times material to this Complaint, Defendant FISERV, INC. was a Wisconsin corporation doing business in California.

4. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 - 25, inclusive, and therefore sues these defendants by such fictitious names and capacities. Plaintiff is informed and believes, and on that basis alleges, that each defendant sued under such fictitious names is in some manner responsible for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the conduct of such defendants.

5. Plaintiff is informed and believes and thereupon alleges, that, at all times material herein each of the Defendants was functioning as the agent, servant, partner, employee and/or working in concert with his, her or its codefendants and was acting within the course and scope of such agency, partnership, employment and/or concerted activity. To the extent that certain acts and omissions were perpetrated by certain Defendants, the remaining Defendants condoned, authorized and ratified said acts and omissions of the codefendants, and in doing the actions mentioned below were acting within the course and scope of his, her or its authority as such agent, servant, partner, and employee with the permission, consent and ratification of the codefendants.

6. Plaintiff is informed and believes and thereupon alleges that, at all times material herein, each of the Defendants was completely dominated and controlled by his, her or its codefendants

and each was the alter ego of the other.

7. Whenever and wherever reference is made in this complaint to any act or failure to act by a Defendant or Defendants, such allegations and reference shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally, including the acts and omissions of Defendants' authorized agents, merchant service providers, independent sales organizations (ISOs), employees, and representatives acting within the course and scope of their agency or employment. At all relevant times, such agents and representatives acted with actual and/or apparent authority to bind Defendants, and Defendants ratified such conduct by accepting merchant applications, processing transactions, and collecting revenue pursuant to agreements negotiated by their agents.

8. Plaintiff is informed and believes and thereupon alleges that, at all times material herein, Defendants, and/or their agents/employees knew or reasonably should have known that unless they intervened to protect Plaintiff, and to adequately supervise, prohibit, control, regulate, discipline, and/or otherwise penalize the conduct of employees of Defendants, set forth below, the remaining Defendants and employees perceived the conduct and omissions as being ratified and condoned.

9. Plaintiff entered into a credit card processing agreement in or about 2015. At various times, credit card processing services were provided by entities that were predecessors-in-interest to, subsidiaries of, or otherwise affiliated with Defendants CARDCONNECT and FISERV. For purposes of this Complaint, all such entities are referred to collectively as "Defendants." At all relevant times, Defendants conducted business as a unified enterprise and are jointly and severally liable for the conduct alleged herein.

10. Defendants CARDCONNECT and FISERV conducted business through authorized merchant service providers, independent sales organizations (ISOs), brokers, and agents who were empowered to market credit card processing services, negotiate merchant agreements, set pricing terms, and communicate with merchants on Defendants' behalf. Defendants exercised control over these agents by providing the processing infrastructure, setting pricing parameters, approving merchant applications, and receiving revenue from the merchant agreements negotiated by such agents. Defendants ratified all acts of their agents by accepting the merchant applications negotiated

by such agents, processing transactions pursuant to those agreements, and collecting fees based on the terms negotiated by their agents. At all relevant times, these agents acted with actual and/or apparent authority to bind Defendants.

11. The agency relationship between CARDCONNECT and its authorized agent and merchant service provider is established by, among other things, the parties' documented course of conduct over more than a decade, including but not limited to the following: Defendants' own ticketing and support systems routed Plaintiff's account matters to and through that agent; the agent submitted pricing terms and pricing changes that Defendants implemented in their own systems (including, as Defendants' agent confirmed in writing, "[a]ll the pricing has been adjusted to what we agreed on" (September 23, 2015) and "[t]he pricing was updated today in the system" (March 31, 2025)); the agent submitted opt-outs from Defendants' semi-annual rate increases through Defendants' designated opt-out process and received written confirmations of those opt-outs from Defendants; and the agent procured Plaintiff's application, delivered and installed Defendants' processing equipment at Plaintiff's premises, and served at all relevant times as Defendants' designated point of contact for Plaintiff's account.

12. Plaintiff is informed and believes that CARDCONNECT was acquired by First Data Corporation in or about 2017; FISERV acquired First Data Corporation in or about July 2019; and since that acquisition, CARDCONNECT has operated as an indirect, wholly owned subsidiary within FISERV's merchant acceptance business. Plaintiff is further informed and believes, and on that basis alleges, that FISERV owns, controls, and operates the processing platform, billing and statement systems, pricing-adjustment programs, and online merchant portal through which Plaintiff's account was priced, billed, and debited; that the semi-annual rate-increase program at the center of this action – described in writing by Defendants' own agent, who stated that after CARDCONNECT was sold to FISERV, "they have been doing adjustments every 6 months with a digital way to opt out" – was designed, implemented, and administered at the FISERV enterprise level and applied uniformly across the California merchant portfolio; that FISERV's systems received the opt-out submissions made on Plaintiff's behalf and issued written confirmations of those opt-outs, yet imposed the rate increases notwithstanding; and that FISERV received and retained the revenue generated by the unauthorized

charges alleged herein. FISERV is accordingly liable both directly, for its own conduct, and as the principal of CARDCONNECT, which acted as FISERV's agent and instrumentality with respect to the conduct alleged herein.

## JURISDICTION AND VENUE

13. This Court has personal jurisdiction over Defendants because Defendants conduct substantial and continuous business in California; solicited Plaintiff's business in California through their California-based authorized agent; entered into and performed processing agreements with Plaintiff and thousands of other California merchants; debited funds directly from Plaintiff's and Class members' California bank accounts; and directed the conduct alleged herein at California residents. Plaintiff's claims arise out of and relate to those forum contacts.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District: Defendants' agent solicited Plaintiff at its premises in Palos Verdes Estates, California; the September 2015 Agreement was negotiated, confirmed in writing, and performed in this District; Defendants' agent delivered and installed the processing equipment at Plaintiff's premises in this District; the unauthorized charges were debited from Plaintiff's bank account in this District; and Defendants' authorized agent who solicited, negotiated, and serviced Plaintiff's account was located within this District. The principal percipient witnesses to the formation, modification, and performance of the parties' agreements reside in this District and in California.

15. No enforceable forum-selection provision requires that this action proceed in any other forum. The operative September 2015 Agreement contains no forum-selection clause. Any forum-selection clause purportedly contained in any "Program Guide" is not part of any operative agreement between the parties and is, in any event, unenforceable, for the reasons alleged below.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### *A. Defendants Solicit Plaintiff and Induce the 2014 Application.*

16. Plaintiff is a small, family-owned market that serves coffee, baked goods, and various prepared foods.

17. In or around the fall of 2014, an authorized agent of Defendants' predecessor processor

solicited Plaintiff's business and induced Plaintiff to sign a Merchant Processing Application (the "2014 Application"). The 2014 Application was a preprinted, standardized form, presented on a take-it-or-leave-it basis, that purported to incorporate by reference a separate, 41-page document of fine-print terms referred to as the "Program Guide." Although the form contained a boilerplate, preprinted recital acknowledging receipt of the Program Guide, no Program Guide was in fact delivered to, reviewed with, or explained to Plaintiff, none of the Program Guide's printed terms was disclosed to, negotiated with, or discussed with Plaintiff, and Plaintiff's attention was never drawn to the recital or to the incorporated terms.

18. After signing the 2014 Application, Plaintiff did not begin processing transactions for over a year. Notwithstanding Plaintiff's inability to use the services, Defendants' predecessor began charging Plaintiff fees almost immediately and continued to do so for months. Plaintiff repeatedly demanded that the predecessor halt the charges and refund the amounts taken; the predecessor did neither.

***B. Plaintiff's September 16, 2015 Written Termination of the 2014 Application.***

19. By the summer of 2015, Plaintiff had had enough. Despite repeated requests, Defendants' predecessor had not refunded the pre-use charges and continued to bill Plaintiff for services Plaintiff was not using.

20. On September 16, 2015, Plaintiff sent the following written termination to Defendants' authorized agent, stating that the provider "has continued to bill us monthly, without any refund on the charges that we previously discussed. I ask that you terminate our account with them today, as soon as possible. We cannot continue to pay for something we are not using."

21. This communication was a clear, unambiguous, written termination and repudiation of any processing relationship or proposed printed terms arising from the 2014 Application. Defendants' authorized agent accepted and acquiesced in this termination. Thereafter, Defendants' agent immediately began re-soliciting Plaintiff's business under new and different terms.

***C. The September 2015 Agreement on Specifically Negotiated, Closed-Set Terms.***

22. Following the September 16, 2015 termination, Plaintiff and Defendants' authorized agent negotiated an entirely new and separate processing agreement (the "September 2015

Agreement") on different terms than those in the 2014 Application. Plaintiff insisted upon, and Defendants' agent agreed to, a closed and exhaustive set of fees and rates with no other charges.

23. On September 18, 2015, Plaintiff sent Defendants' agent an itemized list of the agreed-upon terms and asked him to confirm: "Just to make sure that I have all of the details down correctly, you are offering the following and there are no additional fees beyond the following . . . ." Defendants' agent responded by writing "CORRECT" next to each of the listed terms, and "CORRECT" in response to the question whether there were "[a]ny other annual/monthly fees" he was missing, the answer being none.

24. The agreed-upon terms (collectively, the "Agreed Rates") included a specific discount rate over interchange, a specific per-transaction authorization fee, a specific batch settlement fee, a specific monthly statement fee, a specific annual PCI compliance fee, a specific monthly IRS reporting fee, no early termination fee, and a standalone terminal at no additional cost, with the express written confirmation that there were "no additional fees beyond the following."

25. On September 23, 2015, Defendants' agent confirmed in writing that "[a]ll the pricing has been adjusted to what we agreed on," and Defendants' agent thereafter physically installed the processing terminal at Plaintiff's premises.

26. The September 2015 Agreement was a new and independent agreement, supported by new consideration and different from the 2014 Application in material respects. The September 2015 Agreement, on its face and by its express terms, contained no "Program Guide," no forum-selection clause, among other things. Plaintiff did not assent to any such terms.

27. Defendants ratified the September 2015 Agreement and confirmed that it replaced any prior application, proposed terms, or processing arrangement. Defendants charged Plaintiff at the September 2015 rates from October 2015 onward, never charged Plaintiff at the rates set forth in the 2014 Application following the September 2015 renegotiation, accepted payment under the September 2015 terms for years, and at multiple later points – after Defendants were caught raising rates above the Agreed Rates – purported to "revert" rates back to the Agreed Rates rather than to the 2014 rates, thereby further confirming that the September 2015 Agreement was the operative contract between the parties.

28. Plaintiff is informed and believes, and on that basis alleges, that other California merchants similarly negotiated specific rates and fees with Defendants' authorized agents at the inception of their respective processing relationships, and that those negotiated terms (not any printed form provisions of any "Program Guide") were the operative terms of those merchants' agreements with Defendants.

29. To the extent any contrary provision of the 2014 Application or any "Program Guide" is asserted by Defendants to survive: to the extent the 2014 Application or any printed term therein ever had any contractual effect, Plaintiff repudiated and terminated that arrangement in writing on September 16, 2015.

30. The September 2015 Agreement replaced any prior application, proposed printed terms, or processing arrangement in its entirety. In the alternative, the parties operated under an implied-in-fact contract on the September 2015 terms, insofar as it was the only terms the parties actually negotiated, agreed upon, and performed under for nearly a decade; and any forum-selection, choice-of-law, venue, jury-trial-waiver, limitations-shortening, notice-of-dispute, limitation-of-liability, or any other provision purportedly contained in any "Program Guide" is not part of any operative agreement; in any event, any such provision is also unenforceable as procedurally and substantively unconscionable and as against the public policy of California.

31. In particular, any provision purporting to select Ohio law to govern the parties' relationship is unenforceable under California choice-of-law principles. Application of Ohio law would be contrary to fundamental policies of California embodied in, among other statutes, Business and Professions Code section 17200 et seq., Penal Code section 496, and Civil Code sections 1668 and 3294, and California has a materially greater interest than Ohio in the determination of this controversy: Plaintiff and the Class are California merchants; Defendants solicited them in California through California-based agents; the agreements were negotiated, formed, and performed in California; and the injuries – unauthorized debits from California bank accounts – were suffered in California. Ohio's only asserted connection is a recital in a form document that, as alleged herein, never took effect.

32. Likewise, any provision purporting to limit Defendants' liability, cap Plaintiff's

recovery, or exclude categories of damages is void under California Civil Code section 1668 to the extent it would exempt Defendants from responsibility for their own fraud, willful injury, or violation of law, all of which are alleged herein. No such provision can, in any event, limit the statutory remedies Plaintiff and the Class seek, including restitution under Business and Professions Code section 17200 and treble damages, costs, and attorneys' fees under Penal Code section 496(c).

***D. The "Program Guide" Was Held Unenforceable In Prior Litigation Against CARDCONNECT: The* Kao *Litigation.***

33. In addition to Plaintiff's repudiation of any processing relationship or proposed printed terms arising from the 2014 Application, the 2014 Application and the purported Program Guide also do not apply to either the Plaintiff or other similarly situated California merchants because they were never executed by Defendants and other key signatories. This was the conclusion of the U.S. District court for the Eastern District of Pennsylvania in *Kao v. CardConnect Corp.*, No. 16-cv-5707 (E.D. Pa.) (hereafter "*Kao*"), and it applies with equal force here as a backstop and alternative to the fact that the 2014 Application/Program Guide do not apply because they were repudiated by Plaintiff.

34. Specifically, in *Kao*, Defendants' practice of imposing unilateral rate increases and fees not enumerated in their merchants' initial agreements was the subject of federal litigation.

35. On September 26, 2018, the United States District Court for the Eastern District of Pennsylvania (Ditter, J.) held that, because CARDCONNECT and Wells Fargo Bank, N.A. had not signed the standard form "Merchant Processing Application," no express contract on the printed-form terms had been formed between CARDCONNECT and the merchant, among other things. *Kao v. CardConnect Corp.*, No. 16-cv-5707 (E.D. Pa. Sept. 26, 2018), Dkt. 69. The court (Pappert, J.) reaffirmed those holdings on reconsideration on June 26, 2019. *Id.*, Dkt. 98.

36. The same structural defect identified in *Kao* exists with respect to Plaintiff's 2014 Application and, on information and belief, with respect to the Merchant Processing Applications of all California members of the Class. Defendants' predecessor, Financial Transaction Services, LLC dba CardConnect, never executed the "Accepted By" signature block on Plaintiff's 2014 Application, and Wells Fargo Bank, N.A. never executed the "Wells Fargo Bank" signature block on Plaintiff's 2014 Application. Plaintiff's 2014 Application bears only Plaintiff's signature. On information and

belief, Defendants follow the same uniform practice across their California merchant base of obtaining merchant signatures on form Merchant Processing Applications without ever counter-executing those Applications themselves and without ever obtaining Wells Fargo's counter-execution.

37. Critically, Defendants' counter-execution was not a formality: by the express terms of Defendants' own form, it was a condition of formation. The signature page of Plaintiff's 2014 Application expressly provides: "This Merchant Processing Application and Agreement *shall not take effect until* Client has been approved and this Agreement has been *accepted by CardConnect and Bank*." (Emphasis added.) The corresponding acceptance blocks – "Accepted By Financial Transaction Services, LLC dba CardConnect" and "Wells Fargo Bank, N.A." – are blank. Accordingly, by the plain terms of the instrument Defendants themselves drafted, no express contract on the printed-form terms, including any incorporated "Program Guide," ever took effect as between Plaintiff and Defendants. On information and belief, identical or materially similar conditional-acceptance language appears in the form Merchant Processing Applications signed by California members of the Class, and Defendants likewise failed to execute the acceptance blocks on those Applications.

38. Whether any express contract on the printed-form terms was ever formed is an antecedent question that must be resolved under the law of the forum, California. The choice-of-law and forum-selection provisions on which Defendants rely are themselves contained within the very "Program Guide" whose formation is disputed; those provisions cannot bootstrap themselves into governing the threshold question of whether the contract containing them ever came into existence.

39. Notwithstanding the *Kao* rulings, Defendants did not change the conduct adjudicated unlawful. As to Plaintiff, beginning shortly after the CARDCONNECT acquisition in or around 2018 and continuing through 2025, Defendants imposed increases and fees on Plaintiff and on similarly situated California merchants notwithstanding their actual knowledge of the *Kao* rulings and notwithstanding their settlement of the *Kao* matter.

40. Plaintiff's claims herein are not subject to or released by the *Kao* settlement. To Plaintiff's knowledge, Plaintiff was not a member of the *Kao* settlement class, did not receive notice of the *Kao* settlement, and did not release any claims thereunder. In addition, the misconduct alleged

in this Complaint includes conduct that occurred after the *Kao* settlement effective date and is not within the scope of the released claims as defined therein. Plaintiff is informed and believes, and on that basis alleges, that other California members of the Class likewise were not members of the *Kao* settlement class, did not receive notice, and did not release the claims asserted herein. Plaintiff reserves the right to amend these allegations as discovery permits.

***E. Pattern of Unauthorized Rate Increases (2018–2025).***

41. Notwithstanding the September 2015 Agreement, Defendants repeatedly and systematically violated its terms. The conduct alleged below is documented in writing in correspondence between Plaintiff and Defendants' authorized agent and in Defendants' own merchant statements.

42. In or around 2018, the original processor was acquired by CARDCONNECT. According to Defendants' own agent, the original processor raised Plaintiff's rates above the Agreed Rates immediately prior to that acquisition; Defendants' agent represented that he caught the increase and obtained a "readjustment."

43. By 2019, after the CARDCONNECT acquisition, Defendants had again raised Plaintiff's rates well above the Agreed Rates. Plaintiff confronted Defendants' agent in writing about the discrepancy. Defendants' agent acknowledged the agreed-upon rate, purported to be unaware of the increase, represented that he had not been notified in time to opt Plaintiff out, and represented that "[t]he pricing has been reverted." This was the first documented instance of the opt-out / increase / catch / reset cycle that would repeat for years.

44. On April 14, 2020, after Defendants' rates had again drifted above the Agreed Rates and in response to a notice in a recent statement that further increases were planned, Plaintiff sent Defendants' agent the following explicit, written rejection of any further rate increases: "Also, the most recent statement indicates that the processor will increase discount rates next month. We do not agree to the price increase. Please ensure that our pricing remains at the agreed-upon rates. This is how the processor jacked up our rates previously in spite of our agreement."

45. The April 14, 2020 communication was a clear, unambiguous, contemporaneous, written rejection of any and all future rate increases. Defendants' agent responded the same day,

representing that he had "already opted [Plaintiff] out of the spring rate changes" and that he had "opt[ed Plaintiff] out in advance."

46. After April 14, 2020, every subsequent rate increase Defendants imposed on Plaintiff was imposed not merely without authorization, but in the face of Plaintiff's express, written, contemporaneously communicated rejection, confirmed by Defendants' own agent.

47. Nevertheless, over the course of the relationship, Defendants escalated Plaintiff's processing rates to levels far in excess of the Agreed Rates, ultimately reaching all-in effective rates that materially exceeded both the September 2015 Agreement and prevailing market rates for similarly situated California merchants. None of these increases was ever authorized by Plaintiff. Each was expressly rejected, both prospectively and retrospectively upon discovery.

***F. Unauthorized Fees Beyond the Agreed Set.***

48. In addition to the unauthorized rate increases, Defendants imposed on Plaintiff a series of fixed monthly fees, per-transaction fees, and annual fees that were not enumerated in the September 2015 Agreement and were never authorized by Plaintiff. These unauthorized fees took various forms over the course of the relationship, were imposed under various proprietary names, escalated in amount over time, and in the aggregate constituted a substantial component of Defendants' unauthorized billing. None of the fees was disclosed in or authorized by the September 2015 Agreement, which expressly limited charges to the enumerated terms and confirmed that there were "no additional fees beyond the following."

49. Moreover, the fees were imposed in a confusing manner to obscure whether they were fees imposed by Defendants over and above interchange rates for processing, or whether they were pass throughs from the credit card companies as interchange.

50. Plaintiff is informed and believes, and on that basis alleges, that Defendants imposed similar unauthorized fixed and per-transaction fees on other California merchants whose initial processing agreements likewise enumerated a closed set of fees, and that the imposition of these unauthorized fees was a uniform practice of Defendants applied across their California merchant base.

///

///

***G. Active Concealment: Defendants' Refusal to Provide Statements.***

51. Defendants actively concealed the unauthorized rate increases and unauthorized fees from Plaintiff and from similarly situated California merchants by, among other things, failing to provide statements that would have allowed merchants to detect the overcharges in a reasonable manner. At the inception of the relationship, Plaintiff received paper monthly statements; at some point in or before 2019, Defendants stopped sending paper statements to Plaintiff without notice or consent and without ever providing Plaintiff with the login information needed to access electronic statements through Defendants' online portal.

52. Plaintiff repeatedly asked Defendants' authorized agent, in writing, to restore paper statements. Despite Plaintiff's repeated, documented requests over a period exceeding two years, Defendants never resumed paper-statement delivery.

53. Defendants further compounded the concealment by ceasing the email notifications that had previously alerted Plaintiff that an electronic statement was available for review, leaving merchants who had monitored billing through email notifications without any external prompt to log in and review charges.

54. Defendants had a duty to disclose the unauthorized rate increases and unauthorized fees because, among other reasons, Defendants had exclusive control over the billing systems and statements; Defendants were in a superior position of knowledge regarding the rates and fees being charged; Defendants made affirmative representations about the rates and fees that, in light of Defendants' actual conduct, were misleading without disclosure of the truth; and Defendants actively concealed the truth by withholding statements.

***H. The April 2025 Written Admissions of a Class-Wide Scheme***

55. In or around late March 2025, after laborious review of Defendants' online portal, Plaintiff identified the full scope of Defendants' overcharges and confronted Defendants' authorized agent.

56. On March 31, 2025, Defendants' agent confirmed in writing that he had submitted opt-outs on Plaintiff's behalf for each of the semi-annual pricing adjustments and had received written confirmation from Defendants of those opt-outs. The agent further admitted that Defendants' own

statement messages had failed to disclose the adjustments to fees in violation of Defendants' own representations regarding such notices.

57. On April 4, 2025, Defendants' agent stated that the misconduct extended *class-wide*: "It really is frustrating that I took the time to opt you out and they increased it anyways. I have to create a spreadsheet of all of my merchants and their pricing and create a ticket and upload it to opt out."

58. On April 9, 2025, Defendants' agent further admitted that Plaintiff was entitled to a refund significantly larger than what Defendants had initially calculated, because Defendants' refund analysis had only considered the most recent updates when in fact the overcharging extended further back.

59. These written admissions establish, among other things, that Defendants applied rate increases to Plaintiff's account that Defendants knew had been opted out; that Defendants' own authorized agent maintained a spreadsheet of all of his merchants who were similarly affected, demonstrating that the scheme was systemic and class-wide; that Defendants acknowledged in writing that Plaintiff was entitled to a refund going back years; that no such refund was ever paid; and that, even while Defendants' agent was admitting the misconduct and promising correction, Defendants raised one of the unauthorized fees to its highest level.

***I. Post-Termination Charges and Damages.***

60. In or around mid-2025, Plaintiff ceased processing transactions through Defendants and informed them that it was terminating the processing relationship. Plaintiff's account had no transactions and no sales after that date. Despite the absence of any processing activity, and despite the parties' effectively defunct contractual relationship, Defendants continued to debit fixed monthly fees from Plaintiff's bank account for several consecutive months, including ordinary monthly fees and additional annual charges, on an account that had not processed a single transaction. None of these post-termination charges was ever authorized by Plaintiff, and there was no contractual basis for any fee on a non-processing, dormant account. Plaintiff is informed and believes, and on that basis alleges, that Defendants engaged in the same practice as to other California merchants who terminated their relationships with Defendants or otherwise ceased processing.

61. As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff and the Class have suffered, and continue to suffer, substantial monetary damages, including unauthorized rate overcharges, unauthorized fixed and per-transaction fees, post-termination charges, and consequential damages, all in amounts to be proven at trial.

**TOLLING: DELAYED DISCOVERY, FRAUDULENT CONCEALMENT, AND CONTINUING VIOLATIONS**

62. The applicable statutes of limitations for each of Plaintiff's claims are tolled under the doctrines of delayed discovery, fraudulent concealment, equitable estoppel, continuous accrual, and the continuing-violation doctrine.

63. Plaintiff's claims are also tolled under the doctrine of equitable estoppel. Defendants' authorized agent repeatedly assured Plaintiff, including in 2019, 2020, and 2025, that opt-outs had been timely submitted, that any rate increases had been reverted to the Agreed Rates, and that overcharges would be refunded. Plaintiff reasonably and detrimentally relied on those assurances by refraining from filing suit. Defendants are estopped from invoking any statute of limitations to bar claims arising from the conduct concealed and excused by those representations.

64. Defendants' misconduct is also subject to the doctrine of continuous accrual. Each unauthorized debit by Defendants from Plaintiff's and the Class members' bank accounts constituted a separate, independently actionable wrong, with its own accrual date and limitations period, regardless of when the underlying scheme commenced. Accordingly, every debit imposed within the applicable limitations period preceding the filing of the operative pleading, i.e., at minimum, four years before the filing of the original Complaint, and longer to the extent tolled, is timely, irrespective of when Defendants' broader pattern of misconduct began.

65. Plaintiff did not discover, and could not reasonably have discovered through reasonable diligence, the full scope of Defendants' misconduct until at the earliest March 2025, when Plaintiff conducted a comprehensive review of Defendants' online portal and pieced together the full scope of overcharges. Until that date, Plaintiff reasonably relied on the representations of Defendants' authorized agent, made repeatedly over the years, that opt-outs had been submitted and honored, that the agent was unaware of any rate increases, and that any apparent increases had been "reverted."

66. Moreover, Defendants' billing practices were designed to obscure the unauthorized rate increases and unauthorized fees by incorporating them into complex merchant statements with numerous line items, pass-through fees, and technical terminology that made detection difficult without forensic analysis.

67. Defendants actively concealed the misconduct by, among other things, ceasing to provide paper statements despite repeated requests; ceasing to provide email notifications of electronic statements; drawing fees by ACH directly from Plaintiff's bank account before any statement was generated; and using complex and shifting billing nomenclature designed to obscure the nature, amount, and source of the overcharges. Each unauthorized charge constituted a separate wrong, and Defendants' conduct constituted a continuing practice of unlawful, unfair, and fraudulent activity that was ongoing throughout the Class Period.

68. To the extent Defendants contend that any provision of any "Program Guide" contractually shortens any otherwise-applicable limitations period, any such provision is unenforceable as to Plaintiff and the Class for the reasons set forth above and is, in any event, tolled by Defendants' fraudulent concealment of the misconduct.

69. Similarly, to the extent Defendants contend that any provision of any "Program Guide" required Plaintiff or any Class member to dispute any charge or funding within sixty (60) days of the date of the statement on which it appeared: (a) no such provision is part of the operative September 2015 Agreement or of any agreement actually formed between the parties; (b) any such provision is unenforceable for the reasons set forth above; and (c) compliance with any such condition was prevented, excused, and rendered impossible by Defendants' own conduct, including ceasing to deliver paper statements without notice or consent, failing to provide Plaintiff with credentials to access electronic statements, and ceasing the email notifications that alerted merchants that statements were available. A party may not withhold the very statements on which a statement-based dispute deadline depends and then invoke that deadline as a bar. Plaintiff in any event disputed the unauthorized charges within sixty days of actually discovering them in March 2025, and Defendants, through their authorized agent, acknowledged those disputes in writing and promised correction and refunds, but never provided them.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following Class and Subclasses:

71. ***The Class.*** All California merchants that, at any time during the Class Period, received credit-card or debit-card payment processing services from CARDCONNECT, FISERV, or any of their predecessors or affiliates.

72. ***Rate-Increase Opt-Out Subclass.*** All members of the Class to whom Defendants, directly or through their authorized agents, purportedly opted out of one or more rate increases, and against whom Defendants subsequently imposed any rate increase notwithstanding such representation.

73. ***Excess-Rate Subclass.*** All members of the Class who were charged a discount rate, per-transaction fee, or other variable processing fee in excess of the rate or fee initially agreed upon with Defendants.

74. ***Unauthorized-Fees Subclass.*** All members of the Class who were charged any fixed monthly fee, per-transaction fee, or annual fee that was not initially agreed upon with Defendants, or who were charged any agreed-upon fee in an amount in excess of the agreed amount.

75. ***Post-Termination Charges Subclass.*** All members of the Class who were charged any fee by Defendants after the merchant had ceased processing transactions through Defendants and/or had terminated the parties' relationship.

76. The Class Period is the period beginning four (4) years prior to the filing of the original Complaint in this action and continuing through the date of judgment, subject to extension under principles of delayed discovery, fraudulent concealment, equitable tolling, and the continuing-violation doctrine.

77. Excluded from the Class and Subclasses are Defendants and their parents, subsidiaries, affiliates, officers, directors, employees, and members; any judicial officer presiding over this action and the members of his or her immediate family; any persons who timely and validly opt out; and the legal representatives, successors, and assigns of any such excluded persons. Plaintiff reserves the right to modify the Class and Subclass definitions, and to add or amend Subclasses, prior to class

certification and as discovery may warrant.

78. **Numerosity.** The Class and each Subclass are so numerous that joinder of all members is impracticable. Defendants serve thousands of merchants throughout California. Defendants' own authorized agent admitted in writing that the rate-increase / opt-out misconduct affected "all of [his] merchants" and required maintenance of a spreadsheet of affected merchants. The precise size of the Class can be readily determined from Defendants' books and records.

79. **Commonality and Predominance.** Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions affecting only individual members, including, without limitation: whether Defendants engaged in a uniform practice of imposing unauthorized rate increases on California merchants who had been opted out; whether Defendants engaged in a uniform practice of imposing fixed and per-transaction fees not initially agreed upon with merchants; whether Defendants' uniform billing practices constituted unlawful, unfair, or fraudulent business practices under Business and Professions Code section 17200; whether Defendants engaged in fraud, including fraudulent concealment and fraudulent inducement, as to the Class; whether Defendants breached express or implied contracts with members of the Class, including breaches of the implied covenant of good faith and fair dealing; whether Defendants violated California Penal Code section 496(c); whether any "Program Guide" or similar document is operative against the Class, and whether any forum-selection, choice-of-law, or other provision contained therein is unenforceable as procedurally and substantively unconscionable and as against California public policy; the proper measure of restitution, damages, disgorgement, treble damages, and other monetary relief; whether Plaintiff and the Class are entitled to declaratory and injunctive relief; and whether Plaintiff and the Class are entitled to punitive damages under Civil Code section 3294.

80. **Typicality.** Plaintiff's claims are typical of the claims of the Class. Plaintiff, like other Class members, is a California merchant induced by Defendants' agents to enter a processing relationship on specifically negotiated terms and was thereafter subjected to the same uniform misconduct: unauthorized rate increases despite opt-outs, unauthorized fees, withheld statements, and continuing charges after cessation of processing. The factual and legal bases for Defendants' misconduct are common to all Class members.

81. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class and Subclasses. Plaintiff has no interests adverse to those of the Class. Plaintiff has retained counsel experienced in class-action and consumer-protection litigation.

82. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is small relative to the burden and expense of individualized litigation, making it impracticable for Class members to seek individual redress. A class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Defendants have acted on grounds generally applicable to the Class, making final injunctive and corresponding declaratory relief appropriate as to the Class as a whole.

## FIRST CAUSE OF ACTION

### Unfair Competition in Violation of Business and Professions Code §§ 17200, et seq.

### (On Behalf of the Class Against All Defendants)

83. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

84. California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice." Defendants' conduct, as alleged in detail above and incorporated herein, violates each of the three prongs.

### UNFAIR

85. Defendants' conduct, as alleged in detail above, is unfair within the meaning of section 17200 because it is immoral, unethical, oppressive, unscrupulous, and substantially injurious to small California merchants; the gravity of the harm to the Class substantially outweighs any countervailing benefit to Defendants or to consumers; the harm was not one that consumers could reasonably have avoided in light of Defendants' superior knowledge and exclusive control over the billing systems and statements; and reasonably available alternatives existed for Defendants to advance any legitimate business interest. Defendants' conduct has caused substantial injury to Plaintiff and the Class in the form of unauthorized rate overcharges, unauthorized fixed and per-transaction fees, and post-

termination charges. The practices are also unfair because they frustrate redress. Defendants withhold the statements and notifications a merchant would need to catch the overcharges in time, then point to statement-based dispute deadlines, shortened limitations periods, liability caps, and out-of-state forum and choice-of-law provisions, found in form documents Defendants never executed, to bar or cap recovery of what was taken.

**FRAUDULENT**

86. Defendants' conduct, as alleged in detail above, is fraudulent within the meaning of section 17200 because it was likely to deceive (and, in fact, deceived) reasonable members of the small-business community. Defendants' affirmative representations that there were no hidden fees, that opt-outs had been submitted and honored, that rates had been "reverted" to the agreed levels, and that statements would be provided, were each likely to deceive and did deceive reasonable members of the public, including Plaintiff. Plaintiff's reliance was reasonable given Defendants' superior knowledge, exclusive control over billing, longstanding contractual relationship with Plaintiff, and the explicit written communications of Defendants' authorized agent.

**UNLAWFUL**

87. Defendants' conduct, as alleged in detail above, is unlawful within the meaning of section 17200 because it violates, among other laws, Civil Code sections 1709 and 1710 (deceit), Civil Code section 1572 (fraud), California Penal Code section 496 (theft), and the common law of California governing contract and misrepresentation, as alleged in this Complaint.

88. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct, Plaintiff and the Class have lost money and property and are entitled to restitution of all amounts unlawfully obtained by Defendants, disgorgement of profits derived from Defendants' unlawful conduct, injunctive relief enjoining Defendants from continuing to engage in the conduct alleged, and such other equitable relief as the Court deems just.

89. Defendants' unlawful practices are ongoing. As of the filing of this Second Amended Complaint, Defendants continue to administer the semi-annual rate-increase program described above and continue to impose rate increases and unenumerated fees on California merchants, including merchants who have been opted out of such increases through Defendants' own designated opt-out

process. Nor are the practices ongoing only as to others. On information and belief, Defendants have continued to impose charges on Plaintiff's own dormant account after Plaintiff ceased processing, through at least early 2026 and continuing. In addition, Defendants have asserted that contractual provisions purportedly contained in the "Program Guide" – including a 60-day notice-of-dispute provision and limitation-of-liability provisions – bar or cap the legal claims and legal remedies of Plaintiff and the Class. The unauthorized charges at issue also span a period of years exceeding the limitations periods applicable to certain of Plaintiff's and the Class's legal claims. Accordingly, and to the extent Plaintiff's and the Class's remedies at law are or are determined to be inadequate, Plaintiff and the Class lack an adequate remedy at law for the relief sought under this cause of action. Plaintiff and the Class therefore seek restitution and injunctive relief under section 17200 in the alternative to, and to the extent of any inadequacy of, their legal remedies.

## SECOND CAUSE OF ACTION

**Violation of California Penal Code § 496(c) (Civil Theft)**

**(On Behalf of the Class Against All Defendants)**

90. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

91. California Penal Code section 496(a) imposes liability on any person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft, knowing the property to be so obtained. Section 496(c) provides that any person injured by a violation of section 496(a) may bring an action for three times the amount of actual damages, costs of suit, and reasonable attorneys' fees.

92. Defendants obtained money from Plaintiff and the Class by theft within the meaning of Penal Code section 484, including by knowingly false representations made with intent to defraud (false pretenses), by representing through their authorized agents that opt-outs had been submitted and honored, that there were no hidden fees, that the agreed-upon rates would be charged, and that all fees were itemized, while in fact debiting unauthorized amounts from Plaintiff's and the Class's bank accounts. CARDCONNECT, acting directly and through its authorized agent, and FISERV, which controlled and operated the billing systems and retained the proceeds, acted with the specific intent to

wrongfully obtain, and to permanently deprive Plaintiff and the Class of, their property, knowing that the amounts debited were unauthorized. That knowledge and wrongful intent are established by Defendants' own agent's written admission that Defendants imposed rate increases CARDCONNECT knew had been opted out, and by Defendants' retention of the debited funds even after acknowledging in writing that a refund was owed.

93. Defendants' own authorized agent admitted in writing that Defendants imposed rate increases on Plaintiff's account that Defendants knew had been opted out, and that the same conduct affected the agent's entire merchant book. Defendants received and retained the property thus obtained, knowing it had been so obtained, by accepting the unauthorized debits from Plaintiff's and the Class's bank accounts and recording them as revenue.

94. As a direct and proximate result of Defendants' violation of Penal Code section 496(a), Plaintiff and the Class have suffered actual damages in an amount to be proven at trial. Pursuant to Penal Code section 496(c), Plaintiff and the Class are entitled to three times the amount of actual damages, costs of suit, and reasonable attorneys' fees.

## <u>THIRD CAUSE OF ACTION</u>

**Fraud**

**(On Behalf of the Class Against All Defendants)**

95. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

96. The acts of misrepresentation and concealment alleged in this cause of action were committed by CARDCONNECT, directly and through its authorized agent and merchant service provider – a single, identifiable individual whose identity is known to Defendants and is documented in the written communications referenced herein – who marketed the processing services to Plaintiff, negotiated and confirmed the Agreed Rates, transmitted Plaintiff's opt-out instructions, and made the representations described above and below. FISERV is liable for those acts because, as alleged above, FISERV owned, controlled, and operated the billing systems, statement practices, and pricing parameters through which the misconduct was carried out, directed or ratified that conduct, and accepted and retained the resulting proceeds; CARDCONNECT acted as FISERV's agent and

instrumentality, and the two operated as a single enterprise with respect to the conduct alleged herein.

97. CARDCONNECT, directly and through its authorized agent, made each of the following affirmative misrepresentations to Plaintiff, among others, in writing: (a) on September 23, 2015, that "[a]ll the pricing has been adjusted to what we agreed on" and that there were no annual or monthly fees beyond those enumerated in the September 2015 Agreement; (b) on multiple occasions between 2019 and 2025, in connection with Defendants' semi-annual rate-increase program, that Plaintiff's account had been opted out of announced rate increases, including in written opt-out confirmations generated by Defendants' own opt-out process; (c) following Plaintiff's April 14, 2020 written rejection of all rate increases, that the increases had been or would be reversed and the Agreed Rates restored; (d) on March 31, 2025, that "[t]he pricing was updated today in the system" to correct the unauthorized rates; and (e) in April 2025, that the overcharges would be corrected and that Plaintiff would receive a refund of amounts overcharged. These representations were material. They were false when made, or at a minimum were made with reckless disregard for whether they were true or without reasonable grounds for believing them to be true, and Defendants made them intending that Plaintiff rely on them. The promised corrections and refund were promises Defendants made without any intention of performing.

98. Moreover, at the inception of each merchant's relationship with Defendants – and, in Plaintiff's case, both at the time of the 2014 Application (when Defendants' agent affirmatively represented in writing that there were no hidden fees and that all fees were itemized in the application) and at the time of the September 2015 Agreement (when Defendants' agent confirmed each enumerated term as "CORRECT" and confirmed that there were no other annual or monthly fees beyond those listed) – Defendants represented that the rates and fees set forth in the merchant's initial agreement were the rates and fees that would be charged and that there would be no other rates or fees beyond those expressly disclosed.

99. The closed-set representation was false when made. At the time CARDCONNECT's agent confirmed that the enumerated terms were complete and that there were "no additional fees beyond the following," CARDCONNECT's established and systematic practice – as later confirmed by the rulings in *Kao* and by CARDCONNECT's own agent's written admission that the rate-

increase/opt-out misconduct affected his entire merchant book – was to escalate discount rates at recurring intervals and to impose additional, unenumerated fees once a merchant ceased actively scrutinizing its statements. The representation that the Agreed Rates were the complete and exclusive set of charges was therefore false when made, and CARDCONNECT did not disclose its contrary practice. In reliance on the representation, Plaintiff entered into the September 2015 Agreement – a valid and binding contract – and continued the processing relationship on the represented terms; Plaintiff would not have done so, or would have done so only on materially different terms, had the truth been disclosed. Plaintiff's reliance was justifiable in light of CARDCONNECT's superior knowledge and the express written confirmation of its authorized agent. As a direct and proximate result, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

100. The fraud was not limited to the inducement. For years, from at least 2019 through 2025, CARDCONNECT told Plaintiff that its opt-outs from announced rate increases had been submitted and honored and that the unauthorized increases had been or would be reverted. The increases were imposed anyway. Defendants knew the representations were false: their own systems generated opt-out confirmations and then implemented the very increases that had been opted out, and their agent eventually admitted as much in writing. The increases went through despite the opt-outs he had submitted; the same thing happened across his entire merchant book; and he kept a spreadsheet of the affected merchants. Plaintiff believed what it was told, reasonably so given the agent's role and the written confirmations, and acted on that belief. Had Plaintiff known the truth it would have terminated the relationship years earlier.

101. Defendants' April 2025 promises of correction and a refund were also false, made without any intention of performing. Through their agent, Defendants acknowledged in writing that Plaintiff had been overcharged and was owed a refund, and represented that the pricing would be corrected and repayment would follow. No refund was ever paid. Defendants kept the money. The promises served to lull Plaintiff into inaction, to delay its claims, and to let Defendants hold onto funds they knew were not theirs to keep.

102. CARDCONNECT also concealed the unauthorized increases and fees. As alleged above, it stopped delivering paper statements despite Plaintiff's repeated written requests, never

provided Plaintiff credentials to access electronic statements, terminated the email notifications that told Plaintiff a statement was available, debited Plaintiff's bank account by ACH before any statement issued, and buried the charges under shifting and opaque labels. It did so while under a duty to disclose, both because it had exclusive knowledge and control of the billing systems and statements and because of the partial representations it chose to make.

103. Defendants' conduct was not haphazard. The same pattern repeated itself: a merchant is brought in on a written, closed set of agreed rates. Once the merchant stops watching, the rates are escalated and unenumerated fees are layered in. Detection is suppressed, because the statements and notifications stop coming and the money is taken directly out of the merchant's bank account. When the merchant catches on, Defendants confirm opt-outs and promise reversion and refunds, and impose the increases anyway. And the proceeds are kept, even after Defendants acknowledge in writing that they are owed back. Plaintiff alleges on information and belief that this was Defendants' regular business practice across their California merchant portfolio, not isolated error. The basis for that belief includes the written admissions of Defendants' own agent, who stated that the misconduct affected his entire merchant book and required a spreadsheet of the affected merchants; the standardized form agreements Defendants used across that portfolio; and the practices adjudicated in *Kao*. The practice also has a built-in defense. Because detection is delayed for years, by the time a merchant discovers the overcharges Defendants can point to statement-based dispute deadlines, limitations periods, liability caps, and out-of-state forum provisions, all purportedly contained in form documents Defendants themselves never executed and that, as alleged above, never took effect and are unenforceable.

104. The fraud caused Plaintiff and the Class damages separate and apart from Defendants' breaches of contract. Plaintiff and the Class paid unauthorized rates and fees they would not have paid had they known the truth. They lost years in which they could have detected, disputed, and mitigated the overcharges. They lost the opportunity to take their processing business to competing providers at the agreed or market rates. And they remain deprived of refunds that Defendants acknowledged in writing were owed.

105. The fraud was carried out with malice, oppression, and a conscious disregard for the

rights of Plaintiff and the Class. The duration of the conduct, its systematic nature, and the cynical "reset and repeat" pattern justify an award of substantial punitive damages under Civil Code section 3294.

## FOURTH CAUSE OF ACTION

**Breach of Express Contract**

**(Against All Defendants)**

106. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

107. Plaintiff entered into an express contract with Defendants in September 2015, the terms of which are set forth in the email exchange of September 18 and September 23, 2015 between Plaintiff and Defendants' authorized agent (the September 2015 Agreement). The September 2015 Agreement expressly limited the rates and fees Defendants could charge to those enumerated above and confirmed that there were "no additional fees beyond the following." To the extent the 2014 Application or any printed terms ever had contractual effect, Plaintiff repudiated and terminated that arrangement in writing on September 16, 2015, and the parties thereafter entered into the operative September 2015 Agreement.

108. Defendants breached the express contract by, among other things, charging discount rates and per-transaction fees in excess of the agreed levels; charging fixed monthly fees, per-transaction fees, and annual fees that were not enumerated in the parties' agreement; charging agreed-upon fees in amounts in excess of the agreed amounts; continuing to charge fees after Plaintiff ceased processing and the relationship was effectively terminated; and failing to provide statements as required to permit reasonable monitoring of the account.

109. The September 2015 Agreement, like every contract under California law, contains an implied covenant of good faith and fair dealing that neither party will do anything to injure the other party's right to receive the benefits of the contract. Even if Defendants believed they had any contractual discretion to set rates or impose fees under the September 2015 Agreement, a position Plaintiff disputes, that discretion was constrained by the implied covenant. Defendants breached the implied covenant by, among other things, ignoring opt-out submissions while representing that they

had been honored; withholding statements; raising rates well beyond any conceivable basis in cost; and continuing to charge fees on dormant accounts.

110. Plaintiff and the Class fully performed all material obligations on their part. As a direct and proximate result of Defendants' breaches, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## **FIFTH CAUSE OF ACTION**

### **Breach of Implied-in-Fact Contract**

### **(Against All Defendants)**

111. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

112. In the alternative to the express contract alleged in the Fourth Cause of Action, the parties operated under an implied-in-fact contract on the September 2015 terms, i.e., the only terms the parties actually negotiated, agreed upon, and performed under for nearly a decade. To the extent any document signed in 2014 is deemed to have had or retained contractual effect after September 2015, no enforceable express contract on the 2014 terms was formed because, among other reasons, the only terms the parties actually agreed to and performed under were the September 2015 terms, and because Defendants and Wells Fargo never countersigned the 2014 Application as required for formation. As to other Class members, no enforceable express contract on the printed-form "Program Guide" terms was formed because Defendants and Wells Fargo never countersigned the merchants' Merchant Processing Applications; the parties' relationships are governed by implied-in-fact contracts limited to the rates and fees actually agreed at inception, and Defendants' unilateral imposition of additional rates and fees, including by inserting notices of fee changes in monthly statements, is unenforceable as a matter of law. *See Kao v. CardConnect Corp.*, No. 16-cv-5707 (E.D. Pa. Sept. 26, 2018), Dkt. 69, reaff'd on reconsideration, Dkt. 98 (June 26, 2019).

113. Defendants breached the implied-in-fact contract by, among other things, charging discount rates and per-transaction fees in excess of the rates and fees actually agreed and disclosed at inception; charging fixed monthly fees, per-transaction fees, and annual fees that were not actually agreed and disclosed at inception; charging agreed-upon fees in amounts in excess of the agreed

amounts; continuing to charge fees after Plaintiff or the Class member ceased processing and the relationship was effectively terminated; and failing to provide statements as required to permit reasonable monitoring of the account.

114. Moreover, every contract under California law contains an implied covenant of good faith and fair dealing that neither party will do anything to injure the other party's right to receive the benefits of the contract. The September 2015 Agreement, and, in the alternative, the implied-in-fact contracts of Plaintiff and the Class, each contains such an implied covenant. Even if Defendants believed they had any contractual discretion to set rates or impose fees, a position Plaintiff disputes, that discretion was constrained by the implied covenant. Defendants breached the implied covenant by, among other things, ignoring opt-out submissions while representing that they had been honored; withholding statements; raising rates well beyond any conceivable basis in cost; and continuing to charge fees on dormant accounts.

115. Plaintiff and the Class fully performed all material obligations on their part. As a direct and proximate result of Defendants' breaches of the implied-in-fact contract, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

**<u>SIXTH CAUSE OF ACTION</u>**

**Declaratory Relief**

**(On Behalf of Plaintiff Individually Against All Defendants)**

116. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

117. An actual, present controversy exists between Plaintiff, on the one hand, and Defendants, on the other, concerning whether the September 2015 Agreement is the operative contract between the parties; whether the 2014 Application and any document purporting to be incorporated by reference therein, including any "Program Guide," were ever operative, or whether they survived termination, as against Plaintiff; and whether any forum-selection clause or other provision purportedly contained in any "Program Guide" is enforceable against Plaintiff. The controversy is concrete and immediate: Defendants have asserted, including in pre-litigation correspondence to Plaintiff's counsel, that provisions purportedly contained in a "Program Guide" (including forum-

selection) bar or limit Plaintiff's recovery in this action.

118. Plaintiff seeks a declaration, on its own behalf, that: (a) the operative contract between Plaintiff and Defendants is the September 2015 Agreement; (b) no Program Guide became part of any operative agreement, but, to the extent the 2014 Application or any printed terms ever had contractual effect, they were repudiated, terminated, superseded, and replaced; (c) any "Program Guide" referenced in the 2014 Application is not part of any operative agreement between Plaintiff and Defendants; (d) any forum-selection, choice-of-law, venue, jury-trial-waiver, limitations-shortening, notice-of-dispute, limitation-of-liability, or related provision purportedly contained in any "Program Guide" is unenforceable against Plaintiff; (e) Defendants are obligated to refund to Plaintiff all amounts collected in excess of the rates and fees set forth in the September 2015 Agreement; and (f) such further and additional relief as the Court deems just.

## SEVENTH CAUSE OF ACTION

### Declaratory Relief

### (On Behalf of the Class Against All Defendants)

119. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

120. An actual, present controversy exists between the Class, on the one hand, and Defendants, on the other, concerning the formation, scope, and enforceability of Defendants' standard form Merchant Processing Applications and the "Program Guide" purportedly incorporated therein. Defendants have asserted and continue to assert in litigation against California merchants, including in pre-litigation correspondence to Plaintiff's counsel in this action, that provisions purportedly contained in the "Program Guide" are enforceable against merchants and bar or limit merchant claims arising from Defendants' billing practices.

121. The questions presented by this controversy are common to the Class and capable of class-wide resolution on the basis of common proof from Defendants' own records, including: (a) whether Defendants and Wells Fargo executed the "Accepted By" signature blocks on the Class members' Merchant Processing Applications; (b) whether, in the absence of Defendants' and Wells Fargo's signatures, an enforceable express contract on the printed-form "Program Guide" terms was

formed; (c) whether the "Program Guide" constitutes a procedurally and substantively unconscionable adhesion contract; and (d) whether the forum-selection, choice-of-law, venue, jury-trial-waiver, limitations-shortening, notice-of-dispute, limitation-of-liability, and related provisions, among other things, purportedly contained in the "Program Guide" are unenforceable as procedurally and substantively unconscionable and as contrary to California public policy.

122. Plaintiff seeks a declaration, on behalf of the Class, that: (a) because Defendants and Wells Fargo did not execute the "Accepted By" signature blocks on the Class members' Merchant Processing Applications, no enforceable express contract on the printed-form "Program Guide" terms was formed between Defendants and any Class member; (b) to the extent any contract exists between Defendants and any Class member, it is an implied-in-fact contract limited to the rates and fees actually disclosed to and agreed by the merchant at the inception of the relationship; (c) Defendants' unilateral imposition of rate increases and fees not disclosed at inception, including by inserting notices of fee changes into monthly statements, is unenforceable; (d) the "Program Guide" is a procedurally and substantively unconscionable adhesion contract; (e) the forum-selection, choice-of-law, venue, jury-trial-waiver, limitations-shortening, notice-of-dispute, limitation-of-liability, and related provisions purportedly contained in the "Program Guide" are unenforceable as procedurally and substantively unconscionable and as contrary to California public policy; (f) Defendants are obligated to refund to the Class all amounts collected in excess of the rates and fees disclosed to and agreed by the merchants at inception; and (g) such further and additional relief as the Court deems just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MALAGA COVE RANCH MARKET, INC., individually and on behalf of all others similarly situated, prays for judgment against Defendants CARDCONNECT, LLC, FISERV, INC., and DOES 1 through 25, inclusive, as follows:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

2. For compensatory damages in an amount to be proven at trial;

3. For restitution, disgorgement of wrongfully obtained funds, and all other equitable

monetary relief available under California law, including but not limited to Business and Professions Code section 17200 et seq.;

4. For treble damages pursuant to Penal Code section 496(c);

5. For punitive and exemplary damages pursuant to Civil Code section 3294;

6. For declaratory relief, including declarations that:

a. the operative agreement between Plaintiff and Defendants is the September 2015 Agreement;

b. the 2014 Application and any purportedly incorporated "Program Guide" are not operative or enforceable against Plaintiff;

c. any forum-selection, choice-of-law, venue, jury-trial-waiver, limitations-shortening, notice-of-dispute, limitation-of-liability, or similar provision purportedly contained in any "Program Guide" is not enforceable against Plaintiff or the Class;

d. Defendants' unilateral imposition of rates, fees, charges, or increases not disclosed to and agreed upon by Plaintiff and the Class is unlawful, unauthorized, and unenforceable; and

e. Defendants are obligated to return all amounts collected from Plaintiff and the Class in excess of the rates, fees, and charges authorized by their agreements;

7. For preliminary and permanent injunctive relief enjoining Defendants from continuing to impose, collect, debit, or retain unauthorized rate increases, unauthorized fees, post-termination charges, or any other amounts not disclosed to and agreed upon by Plaintiff and the Class;

8. For an order requiring Defendants to provide an accounting of all rates, fees, charges, increases, debits, refunds, credits, and other amounts assessed to Plaintiff and the Class during the Class Period;

9. For pre-judgment and post-judgment interest at the maximum rate permitted by law;

10. For reasonable attorneys' fees, including but not limited to fees recoverable under Penal Code section 496(c), Code of Civil Procedure section 1021.5, any applicable contract, and any other applicable law;

11. For costs of suit incurred herein; and

12. For such other and further relief as the Court deems just and proper.

DATED: June 15, 2026

**KIZIRIAN LAW FIRM, P.C.**

By: /s/ Armand R. Kizirian
Armand R. Kizirian
Attorneys for Plaintiff
MALAGA COVE RANCH MARKET, INC.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial for all claims so triable.

DATED: June 15, 2026

**KIZIRIAN LAW FIRM, P.C.**

By: /s/ Armand R. Kizirian
Armand R. Kizirian
Attorney for Plaintiff
MALAGA COVE RANCH MARKET, INC.